SMITH v. COMMISSIONER OF INTERNAL REVENUE.

District Court, D. New Hampshire.
May 14, 1937.

Raymond U. Smith, of Concord, N. H., and Frank Barber, of Brattleboro, Vt., for trustee.

Alexander Murchie, U. S. Dist. Atty., of Concord, N. H., and C. J. Belanger, Asst. U. S. Atty., of Manchester, N. H., for the Commissioner of Internal Revenue.

MORRIS, District Judge.

This is a proceeding to determine the amount of income tax payable by the

trustee of the debtor corporation and for an early assessment provided in 48 Stat. § 274, p. 744, 26 U.S.C.A. § 274 (Regulations 94, Income Tax, art. 274-1-2), National Bankruptcy Act, § 64, 11 U.S.C.A. § 104.

The petition was filed March 19, 1937, and the taxable period covered is for the fiscal year ending August 31, 1936.

On the 5th day of November, 1936, the trustee filed the tax return covering the taxable period which showed a gross income of $312,543.58, and deductions of $304,579.13, resulting in a net income of $7,964.45 and a total tax per return of $1,095.11.

The company's books were audited by John H. Page, revenue agent, and on February 1, 1937, a report was made to the trustee showing a net income of $34,-881.90 upon which a deficiency assessment was made amounting to $3,701.15, resulting in a total tax of $4,796.26.

The difference in net income results from a disallowance of $10,811.75, in part, which the auditing agent treated as new construction, replacement, and betterment, allocating the same to capital expenditures, that had been treated in the original return as expenditures for repairs. The several items in dispute as listed in the auditor's account are as follows:

| | | |
|---|---|---|
| (1) Rebuilding beater | | $1,056.41 |
| (2) " incline screen frame | | 3,843.91 |
| (3) New chrome metal bottom in blow pit | | 640.09 |
| (4) New roof on machine shaft alley | | 801.43 |
| (5) Replacements and betterments 3 wet machines | | 1,508.84 |
| (6) New roof over #1 and #2 machines | | 815.43 |
| (7) New roof on digester building | | 1,957.95 |
| (8) New dump spout | | 187.69 |

Flood expense disallowed amounts to $21,218.41.

The case came on for trial on its merits April 2, 1937. During the progress of the hearing counsel for the petitioner admitted that certain of the above-mentioned items were properly allocated to new construction, replacement, and betterments, and thus were capital expenditures. The items so admitted as not properly deducted from gross income in the original return are as follows:

| | |
|---|---|
| (3) New chrome metal bottom in blow pit | $640.09 |
| (4) New roof on machine shaft alley | 801.43 |
| (6) New roof over #1 and #2 machines | 815.43 |

It appears that item No. 7 was an error and should not be included in the above items, the explanation being that originally it was set up on the books of the company as an item of repairs but later was charged to capital expense and therefore was not deducted in the taxpayer's original return.

It is admitted that items 3, 4, and 6, amounting to $2,256.95, should not have been deducted from gross income in the taxpayer's original return. The remaining items now in dispute will be taken up and discussed in their order.

### Repairs On Beater.

The testimony relating to this item discloses that there are fourteen beaters in the mill described as a "beater line" and constant repairs are necessary. A beater consists of a large vat or tub containing revolving fly bars and these had to be replaced. The foundation of the vat was out of line and the woodwork containing the hubs had rotted so they had to be replaced. In order to level up the shaft to which the fly bars are attached the uprights set in a concrete base had to be removed from the concrete, leveled up and reset. Such repairs have to be made once in about five years, depending upon the use made of the beater. The cost of the repairs described was $1,056.41, which was about one-third of the price of a new beater.

The petitioner in his original return deducted this amount from gross income, but the same was disallowed by the auditing agent.

### Repairs Of Screens.

The next item deducted by the petitioner but disallowed by the auditing agent is an item of $3,843.91 for repairs to screens, frames, etc.

There are eight lines of screens in the mill, four of which were repaired. A screen consists of a bronze plate with slots in it about 3 inches long and $9/1000$ of an inch in width. They are set on an incline and the water containing a solution of pulp runs lengthwise of the slots. Each individual screen is about 12 feet in length and the plate is 43 inches wide. They have to be set in a true plane from left to right otherwise a poor quality of paper would result. The repair work consisted of renewing the shafts, resetting the supports in the concrete foundation, replacement of the rubber suction parts because they were leaking and worn in places, the toe-boxes were rotted and had to be replaced, and the same is true of some of the flow-boxes. The eccentric

cams have a throw of about 1/16 of an inch. They rotate 150 to 175 revolutions a minute and as they revolve they lift the toe block of cast iron which is connected with the rubber diaphragm, creating a suction under the bronze plates sucking the solution of pulp while the bark and waste material is washed down the incline of the screen. The revolving of the cams attached to the shafts agitates the rubber diaphragm to create a suction. The life of the bronze plates, costing from $12 to $15, is from six to nine months and possibly a year. The foundations have a life of from ten to twelve years. The screens like nearly every other part of paper mill machinery have to have constant repairs in order to maintain the quality of the paper as they perform one of the most important functions in paper making.

### Repairs To Wet Machines.

There are eight wet machines in the mill, three of which were repaired at an expense of $1,508.84. The function of the wet machine is to take the solution of pulp from the screens and deposit it upon felts which run between wooden rolls that squeeze the water from the pulp. These wooden rolls crack and have to be repaired and the repairs, so far as the records show, consisted of putting in some new rolls and a cement foundation.

### Dump Spout.

The next item of repairs deducted by the petitioner but disallowed by the auditing agent was $187.69 for a new dump spout.

The dump spout conducts the solution of pulp from the beaters to the chest and its life is about five or six years. The dump spout was replaced new.

### Flood Damage.

The trustee deducted on his return the sum of $21,218.41 for flood damage to the penstock and the federal agent disallowed the claim.

I find that the damage claimed was caused by the unprecedented flood in March, 1936.

The mill of the Parker-Young Company is situated on the east branch of the Pemigewassett river, a very rapid stream of considerable size draining a large mountainous area and having a very quick runoff. Water is supplied for the paper mill by a penstock which is about 2 miles in length and 6 feet in diameter, inside measurements. The water is taken from the upper dam, so-called, which was badly damaged during the same flood, but the damage to the upper dam and apron was allowed by the auditing agent. During the flood of 1927 the penstock was damaged and portions of it reconstructed and laid along the permanent shore of the river. Prior to March, 1936, the main channel flowed along the easterly bank of the river. The March flood brought down large quantities of rock and boulders depositing them on the east side of the stream and along the center shifting the channel to the west side. There is a curve in the river and the main current was thrown against the westerly bank undermining it for a distance of nearly half a mile washing it entirely away and taking out considerable portions of the bank west of the penstock. This left the penstock suspended in the air so that it sagged 30 inches or more and the metal between the joints buckled. In trying to repair it they raised it as much as they dared to but there is still about a 24-inch sag and small leaks in it. While repairs were being made the mill had to be closed down two or three days. The sections of the metal penstock are about 16 feet in length and several new sections will have to be set in. The space between the penstock and the west bank of the stream as left by the flood had to be filled by dumping in dirt. This of course would not stand the wash of the river and for the protection of the bank and penstock a crib dam was constructed to keep the river in its channel and prevent the washing away of the reconstructed bank. The crib dam is from 4 to 8 feet high filled with rocks and is about a quarter of a mile in length following the course of the river, thus affording protection to the penstock and westerly bank. The cost of the work was the amount above stated, $21,218.41.

### Applicable Statutes And Regulations.

The pertinent parts of the statutes and regulations involved are as follows:

"§ 23. Deductions from gross income

"In computing net income there shall be allowed as deductions:

"(a) Expenses. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Revenue Act of 1934, c. 277, 48 Stat. 680 (26 U.S.C.A. § 23(a).

380

Treasury Regulations 86:

"Art. 23(a)–1. Business Expenses.—

" * * * Among the items included in business expenses are management expenses, commissions, labor, supplies, incidental repairs, operating expenses of automobiles used in the trade or business. * * *

"Art. 23(a)–4. Repairs.—The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as expense, provided the plant or property account is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, should be charged against the depreciation reserve if such account is kept."

"§ 23. In computing net income there shall be allowed as deductions: * * *

"(f) Losses by corporations. In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise." 26 U.S.C. A. § 23(f).

"Art. 23 (f)–1 Losses by Corporations. Losses sustained by Domestic Corporations during the taxable year and not compensated for by insurance or otherwise are deductible except in so far as not prohibited or limited by sections 23(g), 24(a) (6), 112, 117, 118 and 251. * * *

"§ 24. Items not deductible

"(a) General rule. In computing net income no deduction shall in any case be allowed in respect of— * * *

"(2) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." 26 U.S.C.A. § 24 (a) (2).

"Art. 24–2. Capital expenditures.— Amounts paid for increasing the capital value or for making good the depreciation (for which a deduction has been made) of property are not deductible from gross income. * * *

"Art. 41–3. Methods of accounting.

"(2) Expenditures made during the year should be properly classified as between capital and expense; that is to say, expenditures for items of plant, equipment, etc., which have a useful life extending substantially beyond the year should be charged

to a capital account and not to an expense account; and (3) In any case in which the cost of capital assets is being recovered through deductions for wear and tear, depletion, or obsolescence, any expenditure (other than ordinary repairs) made to restore the property or prolong its useful life should be added to the property account or charged against the appropriate reserve and not to current expenses."

Question Presented.

Is plaintiff entitled to the reductions claimed in his return under section 23(a) and (f) of the Revenue Act of 1934, or were they properly disallowed under the provisions of section 24(a) (2) by the revenue agent who made the examination of the tax return?

Rulings of Law.

The government contends that the deductions authorized by section 23 of the act do not include any of the items for repairs to the machinery and equipment of the debtor and that they were properly disallowed by the revenue agent on the ground that they are not ordinary expenses for repairs in the sense these terms are used in the statute.

The trustee claims that the money expended for repairs on the beater line, screens, wet machines, and spout are deductible.

█ There is no well-defined line between ordinary and necessary expenses incurred in making repairs. Department regulations have the force of law (Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289–294, 55 S.Ct. 158–161, 79 L.Ed. 367) but they are not specific so that much must be left to the decisions of the taxing agent.

█ The testimony establishes that the repairs to machinery and equipment were of a substantial nature. In some instances foundations were repaired and entire parts replaced. The book entries containing the items of expense such as "Rebuilding No. 5 Beater" show that the repairs were more than ordinary repairs and that they were in the nature of replacements and betterments.

Counsel for the debtor claims that such repairs are necessary and being made continually in a paper mill where heavy machinery is in constant operation. He calls attention to the fact that the allowance for depreciation on the mill and machinery is set up at 7½ per cent. on $270,000; that the

machinery alone is worth much more than the figure stated and that it does not make any difference so far as an individual machine is concerned whether the cost is set up and the expenses of repairs are set up against it or whether the valuation is fixed upon the entire plant and a reasonable depreciation allowed for each year. But this method of bookkeeping would involve complications and is not the method pursued by the tax commissioner according to Regulations, art. 41(3).

I hold that the federal agent correctly disallowed the above-mentioned items in dispute.

### Flood Damage.

After the flood of 1927 the penstock was moved and laid on sleepers along the permanent west bank of the river. Except for the flood of March, 1936, or other unusual casualties, it would have remained there as long as the mill continued in operation. There would have been no occasion for any unusual expense. Only ordinary repairs and replacement of parts would have been necessary at such times as required. It had existed in its present location from the fall of 1927 to March, 1936. As far as its location there was no occasion for any expenditure on its foundation. It was located on the solid bank of the river high and dry above the water and on the bank opposite from the main channel. The flood water shifted the main channel and current of the river, carried away the permanent bank beneath the penstock and to some distance westerly of the same. This excavation had to be filled by dumping in dirt and rocks, but such work constituted only temporary repairs and would not take the place of the permanent bank which had been washed away. The current of the river had been so changed that its force struck against the west bank making it necessary to protect it for some distance below the actual washout. The building of the crib or wing dam was determined on as the best way to restore conditions to as nearly normal as possible. What was done adds nothing to the efficiency or normal life of the penstock, that was well enough as it was. The damage was not caused by the natural depreciation of the penstock or the natural erosion of the bank, if any, the repairs of which would be charged against normal depreciation, but by an unprecedented flood causing a change in the course of the river and consequent washout and injury to the bank and penstock.

I hold that the sum expended in repairing the flood damage is deductible from gross income under section 23(f) (article (f)–1).

The trustee is not seeking to recover back any tax assessed and paid on his original return. His claim is that upon a fair accounting and allowance of deductible expenditures no deficiency tax should be assessed.

NOTE:

| Summary | | |
|---|---|---|
| Flood damage allowed as deductible deduction taken in the original return | | $21,218.41 |
| Amounts disallowed by the agent on account of repairs | $10,811.75 | |
| New roof on digester building deducted from agent's assessment because it was charged to capital in the original return and was disallowed by the agent through error | 1,957.95 | |
| | 8,853.80 | |
| Balance, items properly disallowed by agent numbered 1, 2, 3, 4, 5, 6 and 8 | 8,853.80 | |
| An item of bad debts recovered was | 5,112.71 | 3,741.09 |

This item was brought into profit and loss in the original return through error and was eliminated by the agent on his re-computation. The item, therefore, should be credited against any amount on which an additional tax is to assessed.

Subtracting that item from the amount of $8,853.80 leaves a balance of $3,741.09 on which a tax should be assessed at the rate of 13¾% or $514.40.　　　　Tax　514.40

The defendant's claim is allowed in the sum of $514.40.